Stephen J. Joncus, OSB #013072
KLARQUIST SPARKMAN, LLP
121 S.W. Salmon Street, Suite 1600
Portland, Oregon  97204
Email:  stephen.joncus@klarquist.com
Telephone:  503-595-5300
Facsimile:  503-595-5301

*Attorneys for Plaintiff UFA Holdings, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON (PORTLAND)

| | |
|---|---|
| UFA HOLDINGS, INC., | Civil No. 10-639 ST |
| Plaintiff, | |
| v. | |
| THE PERFORMANCE ACQUISITION GROUP COMPANY, DAVID ORKNEY, B.G. EILERTSON, RON MENCONI, ED ARINIELLO, JOHN DOES 1 THROUGH 5 AND JOHN DOE ENTITIES 1 THROUGH 5, | **PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION** |
| Defendants. | **EXPEDITED HEARING REQUESTED** |

# TABLE OF CONTENTS

Page

INTRODUCTION .......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

    A.    The Parties ............................................................................................ 2

    B.    The G.I. Joe's Marks And Registration Of The G.I. Joe's Marks ........................ 3

    C.    Use And Promotion Of The Marks ................................................................ 6

    D.    UFA Acquires The Marks, Intellectual Property And Associated Goodwill ........ 9

    E.    Defendants' Selection And Use Of The Infringing Marks .............................. 10

    F.    The "gijoesonline.com" Website ................................................................ 12

    G.    Events Leading Up To This Suit ................................................................. 13

ARGUMENT ............................................................................................................... 15

    A.    UFA WILL SUCCEED ON THE MERITS OF ITS CLAIMS .......................... 16

        1.    Defendants Have Infringed The G.I. Joe's Marks ................................. 16

            a.    UFA Is The Owner Of Rights In The G.I. Joe's Marks .............. 17

            b.    There Is A Likelihood Of Confusion ........................................... 17

                i.    The G.I. Joe's Marks and Defendants' infringing marks are identical or confusingly similar ...................... 18

                ii.    The parties' services offered under the marks are identical ................................................... 20

                iii.    The parties advertise and promote their goods and services in the same marketing channels ....................... 21

                iv.    The G.I. Joe's Marks are strong ...................................... 22

                v.    Defendants intended to select an infringing mark .......... 23

                vi.    The parties will expand into other markets ..................... 24

                vii.    Degree of care likely to be exercised by the purchasers .. 25

            c.    The G.I. Joe's Mark Was Not Abandoned ................................... 25

        2.    Defendants Have Falsely Advertised That They Are Associated With The G.I. Joe's Marks ................................................... 26

        3.    Defendants Have Diluted The G.I. Joe's Marks ..................................... 27

            a.    The G.I. Joe's Marks Are Famous And Distinctive In Oregon ... 28

            b.    Defendants Began Using The Infringing Marks Long After The G.I. Joe's Marks Became Famous ............................... 29

          c.     Defendants Use Of The Infringing Marks Is Likely To Cause Dilution Of The Famous G.I. Joe's Marks ................ 30

       4.     Defendants Have Engaged In Unlawful Cybersquatting ........................ 31

   B.     THE COURT MAY PRESUME IRREPARABLE HARM ............................... 33

   C.     THE BALANCE OF HARMS FAVORS ISSUANCE OF THE PRELIMINARY INJUNCTION............................................................ 34

   D.     THE COURT SHOULD NOT REQUIRE UFA TO POST A BOND ............... 35

CONCLUSION................................................................................................................. 35

# TABLE OF AUTHORITIES

Page

**Cases**

*AMF, Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979) ................................................................ 17, 20, 24, 25

*Bosley Medical Institute, Inc. v. Kremer*,
  403 F.3d 672 (9th Cir. 2005) ................................................................ 17, 31

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
  174 F.3d 1036 (9th Cir. 1999) ................................................................ passim

*DaimlerChrysler v. The Net, Inc.*,
  388 F.3d 201 (6th Cir. 2004) ................................................................ 31

*Dreamwerks Prod. Group v. SKG Studio*,
  142 F.3d 1127 (9th Cir. 1998) ................................................................ 25

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
  967 F.2d 1280 (9th Cir. 1992) ................................................................ 16, 20, 23

*Edge Wireless, LLC v. U.S. Cellular Corp.*,
  312 F.Supp.2d 1325 (D. Or. 2003) ................................................................ passim

*Fleishmann Distilling Corp. v. Maier Brewing Co.*,
  314 F.2d 149 (9th Cir. 1963) ................................................................ 20

*Gorback v. Reno*,
  219 F.3d 1087 (9th Cir. 2000) ................................................................ 35

*GoTo.Com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2000) ................................................................ passim

*Grocery Outlet Inc. v. Albertson's Inc.*,
  497 F.3d 949 (D. Or. 2007) ................................................................ 26

*Interstellar Starship Services, Ltd. v. Epix, Inc.*,
  304 F.3d 936 (9th Cir. 2002) ................................................................ 23, 31

*Mattel, Inc. v. Walking Mountain Productions*,
  353 F.3d 792 (9th Cir. 2003) ................................................................ 17

*Meridian Transp. Resources, LLC v. Magic Carrier Resources, LLC*,
  518 F.Supp.2d 1255 (D. Or. 2007) ................................................................ 18

*Metro Pub., Ltd. v. San Jose Mercury News*,
  987 F.2d 637 (9th Cir.1993) ................................................................ 33

*Roe v. Anderson*,
  134 F.3d 1400 (9th Cir. 1998) ................................................................ 33

*Sardi's Restaurant Corp. v. Sardie,*
   755 F.2d 719 (9th Cir. 1985) .................................................................................. 15

*Southland Sod Farms v. Stover Seed Co.,*
   108 F.3d 1134 (9th Cir. 1997) ................................................................................ 26

*Starbucks Corp. v. Lundberg,*
   2005 WL 3183858, *7 (D. Or. Nov. 29, 2005)............................................... 28, 29

*Two Pesos, Inc. v. Taco Cabana, Inc.,*
   505 U.S. 763 (1992)................................................................................................ 17

*Virtual Works, Inc. v. Volkswagen of Am., Inc.,*
   238 F.3d 264 (4th Cir. 2001) .................................................................................. 31

*Wedgwood Homes, Inc. v. Lund,*
   659 P.2d 377 (Or. 1983) ............................................................................. 28, 29, 30

*Zipee Corp. v. U.S. Postal Service,*
   140 F.Supp.2d 1084 (D. Or. 2000) .................................................................. 16, 31

## Statutes

15 U.S.C. § 1057.................................................................................................... 17, 21

15 U.S.C. § 1114.......................................................................................................... 16

15 U.S.C. § 1125.............................................................................................. 16, 26, 31

Oreg. Rev. Stat. § 647.095 .......................................................................................... 16

Oreg. Rev. Stat. § 647.107 ..................................................................................... 16, 28

## Other Authorities

2. J. Thomas McCarthy, *Trademarks and Unfair Competition*
   § 11:83 at 11-143 (rev. ed. 1999)...................................................................... 22, 23

## <u>INTRODUCTION</u>

This is a blatant case of unfair competition, trademark infringement, and public deception that pits the owner of the venerable G.I. Joe's trademark against an imposter G.I. Joe's store that recently opened in a strip mall near Portland, Oregon.

The famous G.I. Joe's trademark dates back to 1947.  Unhappily, the business operated by G.I. Joe's, Inc. fell into bankruptcy in 2009 and was dissolved.  UFA Holdings, Inc. ("UFA"), owner of Wholesale Sports Outdoor Outfitters ("Wholesale Sports"), purchased the G.I. Joe's trademark, along with all the related marks, intellectual property and associated goodwill, from the bankruptcy estate for $215,000.

Despite being fully aware that UFA owns all rights in the G.I. Joe's trademarks, the Defendants opened a G.I. Joe's retail store in Bethany, Oregon.  Defendants' flagrant business plan is to steal the goodwill in the G.I. Joe's mark from UFA.  Defendants' website advertising of their new business reveals that it is doing everything possible to persuade consumers that it is the old G.I. Joe's, Inc.  Defendants' attempt to profit by deceiving consumers could not be more notorious – it is holding itself out as G.I. Joe's and, as graphically portrayed below, it is using the exact same mark, font, and the overall design of the G.I. Joe's trademark to deceive G.I. Joe's customers into believing that the original G.I. Joe's store is back.

[Remainder of page intentionally left blank.]

**G.I. Joe's Trademarks Owned by Plaintiff**




**Example of Defendants' Infringing Use**



The main point of unfair competition and trademark law is to prevent consumer confusion about the source of goods and services.  In this case, Defendants are banking on consumer confusion, by trading on the goodwill in Plaintiff's G.I. Joe's mark.  Plaintiff is entitled to a preliminary injunction.

<u>**STATEMENT OF FACTS**</u>

**A.    The Parties.**

Plaintiff UFA is a Utah corporation with its principal place of business located at 4838 Richard Road SW, Suite 700, Calgary, Alberta, Canada T3E6L1.  (Declaration of Jim Ramsden ("Ramsden Decl.") ¶ 2; Ramsden Decl. Ex. 1.)  UFA owns Wholesale Sports Outdoor Outfitters ("Wholesale Sports"), which services a community of lifelong hunters, fishers and campers and has been outfitting customers for more than 30 years.  (*Id.* ¶ 3.)  Wholesale Sports has 24 stores and counting, with 15 stores in the Pacific Northwest and 11 stores in Canada.  (*Id.*)  Of its 15

PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION
Page 2

U.S. stores, 3 of those stores are located in Oregon (Portland, Bend and Salem), 7 are located in

Washington, with the remaining 5 stores in Idaho, Montana and North Dakota. (*Id.*)

Wholesale Sports stocks thousands of brand-name outdoor products at everyday low

prices. (*Id.* ¶ 4.) Wholesale Sports' extensive selection of hunting, archery, fishing, camping

and hiking equipment can be found at any of Wholesale Sports' retail locations or online at

www.wholesalesports.com. (*Id.*; *see also* Ramsden Decl. Ex. 2.)

Defendant The Performance Acquisition Group Company ("PAGC") is an Oregon

corporation formed on September 18, 2009. (*See* Declaration of Kristin B. Heebner ("Heebner

Decl.") Ex. A.) Defendants David Orkney ("Orkney"), B.G. Eilertson ("Eilertson"), Ron

Menconi ("Menconi") and Ed Ariniello ("Ariniello") (collectively, "Individual Defendants") are

and are owners or affiliates of PAGC and former executives of G.I. Joe's, Inc., a now dissolved

company. (Heebner Decl. Ex. B at p. 1, p. 3 banner.)

**B.     The G.I. Joe's Marks And Registration Of The G.I. Joe's Marks.**

UFA is the owner of the following federally registered trademarks (hereinafter, "G.I.

Joe's Marks"), along with all common law rights in the marks and all associated goodwill:

| Mark | Serial No. / Filing Date | Reg. # / Reg. Date | Goods / Services |
|------|--------------------------|--------------------|------------------|
| **G.I. JOE'S** | 73-153,358 <br> 1977-12-27 | 1,126,617 <br> 1979-11-06 | Retail department store services, in Class 42 |
| **G.I. JOE'S SPORTS, OUTDOOR & MORE** <br> **G.I. JOE'S** <br> SPORTS, OUTDOOR & MORE | 78-896,070 <br> 2006-05-30 | 3,222,739 <br> 2007-03-27 | On-line retail store services featuring sporting goods, apparel and automotive goods; Retail department stores; Retail shops featuring sporting goods, apparel and automotive goods; Retail sporting goods stores; Retail stores featuring sporting goods, apparel and automotive goods; Retail sporting goods, apparel and automotive goods stores, in Class 35 |

| Mark | Serial No. / Filing Date | Reg. # / Reg. Date | Goods / Services |
|---|---|---|---|
| **G.I. JOE'S THE SPORTS & AUTO STORE**  | 78-389,777 2004-03-24 | 2,962,544 2005-06-14 | Retail department store services featuring sporting goods, apparel and automotive goods, in Class 35 |
| **SEIZE THE WEEKEND** | 78-359,356 2004-01-29 | 2,962,357 2005-06-14 | Retail department store services featuring sporting goods, apparel and automotive goods, in Class 35 |
| **SEIZE THE WEEKEND**  | 78-359,388 2004-01-29 | 2,962,358 2005-06-14 | Clothing, namely, infant bodysuits and hats, in Class 25; Retail department store services featuring sporting goods, apparel and automotive goods, in Class 35 |
| **JOE'S SPORTS, OUTDOOR & MORE** | 77-129,314 2007-03-13 | 3,446,102 2008-06-10 | On-line retail store services featuring sporting goods, apparel and automotive goods; Retail department stores; Retail shops featuring sporting goods, apparel and automotive goods; Retail sporting goods stores; Retail stores featuring sporting goods, apparel and automotive goods; Retail sporting goods, apparel and automotive goods stores, in Class 35 |
| **JOE'S SPORTS, OUTDOOR & MORE**  | 77-071,791 2006-12-27 | 3,445,920 2008-06-10 | On-line retail store services featuring sporting goods, apparel and automotive goods; Retail department stores; Retail shops featuring sporting goods, apparel and automotive goods; Retail sporting goods stores; Retail stores featuring sporting goods, apparel and automotive goods; Retail sporting goods, apparel and automotive goods stores, in Class 35 |
| **JOE'S SPORTS, OUTDOOR & MORE**  | 77-252,213 2007-08-10 | 3,487,466 2008-08-19 | Retail sporting goods, apparel and automotive goods stores; Retail shops featuring sporting goods, apparel and automotive goods; Retail department stores; Retail sporting goods stores; On-line retail store services featuring sporting goods, apparel and automotive goods, in Class 35 |

| Mark | Serial No. / Filing Date | Reg. # / Reg. Date | Goods / Services |
|---|---|---|---|
| JOE'S SPORTS & OUTDOOR <br> JOE'S Sports & Outdoor | 77-252,168 <br> 2007-08-1 | 3,623,721 <br> 2009-05-19 | Retail stores featuring sporting goods, apparel and automotive goods; Retail shops featuring sporting goods, apparel and automotive goods; Retail sporting goods stores; Retail department stores; On-line retail store services featuring sporting goods, apparel and automotive goods, in Class 35 |
| JOE'S SPORTS & OUTDOOR <br> JOE'S Sports & Outdoor | 77-252,145 <br> 2007-08-10 | 3623720 <br> 2009-05-19 | On-line retail store services featuring sporting goods, apparel and automotive goods; Retail department stores; Retail shops featuring sporting goods, apparel and automotive goods; Retail sporting goods stores; Retail stores featuring sporting goods, apparel and automotive goods, in Class 35 |
| JOE'S SPORTS GEAR <br> JOE'S SPORTS GEAR | 78-358,960 <br> 2004-01-28 | 2,962,354 <br> 2005-06-14 | Duffle Bags, in Class 18; <br> Clothing, namely, athletic socks and athletic snap off pants, in Class 25; <br> Sporting goods, namely, billiard tables, soccer tables, table tennis tables, pool tables, multi-games, steppers, basketball nets, croquet sets, golf sets, baseball gloves, softball gloves, skate pads, yoga balls, ball screens, horseshoes games, badminton games, volleyball sets, tetherball sets, bocce games and trampolines, in Class 28 |
| JOE'S SPORTS & OUTDOOR | 77-252,187 <br> 2007-08-10 | 3,623,722 <br> 2009-05-19 | Retail stores featuring sporting goods, apparel and automotive goods; Retail shops featuring sporting goods, apparel and automotive goods; Retail department stores; On-line retail store services featuring sporting goods, apparel and automotive goods; Retail sporting goods stores, in Class 35 |
| JOE'S OUTDOORS <br> Joe's Outdoors | 78-359,055 <br> 2004-01-28 | 2,962,356 <br> 2005-06-14 | Outdoor furniture, namely, double chairs, rocking chairs, cots, aluminum chairs, couches, children's chairs, stadium seats, beach chairs, aluminum tables and folding tables, in Class 20; <br> Tents and fabric carport canopies, in Class 22; <br> Clothing, namely, T-shirts, casual button up shirts, polos, fleece vets, fleece jackets, sweatshirts, casual pants, zip off pants, capri pants, outdoor socks, water shorts, outdoor shirts, outdoor jackets, sweaters, ski pants and ski jackets, IN Class 25 |

| Mark | Serial No. / Filing Date | Reg. # / Reg. Date | Goods / Services |
|---|---|---|---|
| **JOE'S ON-DECK SERIES**  | 78-359,021 2004-01-28 | 2,962,355 2005-06-14 | Athletic bags, namely, dugout bags, bat bags and roller bags, in Class 18;Sporting goods, namely, softballs, baseballs, whiffle baseballs, baseball pitch screens and softball pitch screens, in Class 28 |
| **GEAR FOR YOUR FAVORITE SEASON** | 78-896,147 2006-05-30 | 3,218,049 2007-03-13 | On-line retail store services featuring sporting goods, apparel and automotive goods; Retail department stores; Retail shops featuring sporting goods, apparel and automotive goods; Retail sporting goods stores; Retail stores featuring sporting goods, apparel and automotive goods; Retail sporting goods, apparel and automotive goods stores, in Class 35 |
| **NTG**  | 78-977,129 2004-03-24 | 3,134,435 2006-08-22 | Bags, namely, athletic bags, duffel bags, backpacks, in Class 18 Clothing, namely pants, shirts, athletic pants, and coats, in Class 25 |
| **NORTH X NORTHWEST**  | 78-480,926 2004-09-09 | 3,017,741 2005-11-22 | Sporting goods, namely, floating tubes used in connection with fishing and fishing rods, in Class 28 |

(*See* Heebner Decl. Ex. C, C1-C17.)

## C.    Use And Promotion Of The Marks.

Until its corporate dissolution on October 2, 2009, G.I. Joe's, Inc. was an Oregon

corporation with its principal place of business located at 9805 Boeckman Road in Wilsonville,

Oregon.  (Heebner Decl. Ex. D.)  G.I. Joe's, Inc. was founded in 1952 in Portland, Oregon, and

was in the business of selling sporting goods, sports and recreational equipment, apparel and

footwear, and other related items to consumers through land-based stores.  (Heebner Decl. Exs.

B, C1.)

According to the records of the U.S. Patent and Trademark Office, G.I. Joe's, Inc. began using the mark G.I. JOE'S in connection with its retail store services at least as early as 1947. (Heebner Decl. Ex. C1.)  G.I. Joe's Inc. subsequently made substantial investments in advertising and promoting the G.I. Joe's Marks.  (*See e.g.* Heebner Decl. Exs. C1-C17, F, G.) G.I. Joe's, Inc.'s had "for years urged customers to 'seize the weekend, get the gear, go to Joe's.'"  (Heebner Decl. Ex. H at p.2, Ex. C5 at p. 5, Ex. C6 at p. 9, Ex. F at p. 4.)

In the mid 1990's G.I. Joe's, Inc. launched an Internet website located at www.gijoes.com.  (Heebner Decl. Ex. I at p. 2, Ex. G.)  On its website, G.I. Joe's, Inc. advertised, promoted, marketed and offered for sale an extensive selection of sporting goods, including recreational and fitness-related equipment and other related sporting goods and products.  (Heebner Decl. Ex. G.)  The G.I. Joe's Marks were displayed prominently on G.I. Joe's, Inc.'s website and were used in the marketing of G.I. Joe's, Inc.'s good and services.  (*Id.*; *see also* Ex. C10 at p. 6, Ex. C12 at p. 6, Ex. C13 at p. 6, Ex. C14 at p. 7, Ex. C17 at p. 6.)

In 2004, G.I. Joe's, Inc. applied for registration of several marks using the words JOE'S or G.I. JOE'S, as well as the mark SEIZE THE WEEKEND.  The applications show the word JOE'S and G.I. JOE'S used in the same font and, in the case of the marks G.I. JOE'S, THE SPORTS & AUTO STORE and JOE'S SPORTS GEAR & DESIGN, the same logo.  (Heebner Decl. Exs. C2-C7.)  The above applications cite first use dates ranging from 1999 to 2002 for the JOE'S marks.  (*Id.*)  The consuming public became used to seeing the marks including the word "JOE'S" used side-by-side with the marks including the term "G.I. JOE'S" on advertising and marketing material and on the website at www.gijoes.com, since at least as early as 1999. (Heebner Aff. Ex. C5 at pp. 4-5, Ex. C6 at pp. 7, 9, Ex. C10 at p. 6, Ex. G at p. 8.)

By 2007, G.I. Joe's, Inc. used the G.I. Joe's Marks and the G.I. Joe's trade name in operating 27 retail sporting goods stores in Oregon and Washington, as well as on its online store.  (Heebner Decl. Ex. F at p. 7, Ex. G.)  G.I. Joe's, Inc. sold various goods and services under the G.I. Joe's Marks, including apparel, athletic and sporting gear, automotive goods and other merchandise.  (Heebner Decl. Ex. C10-C17, Ex. F, Ex. G.)

In 2007, a decision was made by the former owners to change store signage and other materials to feature the JOE's marks.  (Heebner Decl. Ex. F at pp. 4-5.)  Applications for registration of additional JOE's marks, essentially identical to the existing registrations for G.I. JOE'S marks, using the same logo, font and stylization, minus the "G" and "I", were filed with the USPTO in 2006 and 2007.  (Heebner Decl. Exs. C12-C17.)  Certain changes were made to store signage and collateral materials to reflect the new JOE'S service mark.  (*Id.*; *see also* Ex. F.)  However, the G.I. Joe's trademark remained in use as the name of the company – G.I. Joe's, Inc. – and in other ways until the company was dissolved in October 2009.  (Heebner Decl. Ex. D.)  The domain name www.gijoes.com remained in use to redirect visitors to the website located at www.joessports.com.  (Heebner Decl. ¶ 12; Ex. K.)

Due to G.I. Joe's, Inc.'s substantial investment in promoting, advertising and publicizing the G.I. Joe's Marks, after decades of making use of the G.I. Joe's Marks, and following dramatic expansion of the G.I. Joe's retail stores and its presence on the Internet, the G.I. Joe's Marks had acquired substantial fame, goodwill and recognition in the State of Oregon and surrounding region at the time at the time of assignment of the G.I. Joe's Marks to UFA.  (*See e.g.* Heebner Decl. Ex. C1-C17, Ex. F, Ex. G, Ex. H.)  The G.I. Joe's Marks are inherently distinctive marks, serving to identify and distinguish the goods and services offered under the G.I. Joe's Marks from the goods and services of other companies.  (*See* Heebner Decl. Ex. C.)

Defendants admit that the brand had been built up over the course of the 57 year operation.

(Heebner Decl. Ex. B, Ex. G, Ex. I.)

**D.     UFA Acquires The Marks, Intellectual Property And Associated Goodwill.**

On or about March 4, 2009, G.I. Joe's, Inc. filed a voluntary petition for relief under

Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Delaware.

(Heebner Decl. Ex. L.)  At the time of the bankruptcy filing, G.I. Joe's, Inc. operated thirty-one

(31) sporting goods retail stores in the States of Washington, Oregon and Idaho and sold goods

online at www.joessports.com, also accessed through www.gijoes.com.  (Heebner Decl. Ex. H at

pp. 3-4, Ex. B at p. 2.)

Liquidation of G.I. Joe's, Inc. was completed on or about May 30, 2009, and all of G.I.

Joe's, Inc. retail stores were closed.  (Heebner Decl. Ex. B at 2.)  The G.I. Joe's Marks, trade

names and other intellectual property and goodwill were listed as assets ("Assets") of the

bankruptcy estate and were auctioned for sale by the bankruptcy trustee.  (Ramsden Decl. Ex. 3.)

UFA successfully bid against another company for purchase of the Assets, including the

G.I. Joe's Marks, for $215,000.  (Ramsden Decl. ¶ 5, Ex. 3.)  Defendants did not place a bid for

purchase of the G.I. Joe's Marks even though as executives of G.I. Joe's, Inc. they were of aware

of the auction and had the opportunity to bid.  (Ramsden Decl. ¶ 6; *see also* Heebner Decl. Ex. F

at ¶ 2.)

As the successful bidder at the auction, UFA acquired all of the Assets through an Asset

Purchase Agreement (the "Purchase Agreement") executed July 24, 2009, between UFA, as

purchaser, and G.I. Joe's, Inc. and G.I. Joe's Holding Corp., as sellers.  (Ramsden Decl. Ex. 3.)

The "Assets" that UFA purchased are defined in the Purchase Agreement as "all of the

trademarks, trade names, domain names and service marks (including logos) and related

[i]ntellectual [p]roperty rights therein, and all goodwill associated" with the G.I. Joe's Marks. (*Id.*)

G.I. Joe's, Inc. and G.I. Joe's Holding Corp. represented and warranted in the Purchase Agreement that they were the legal and beneficial owners of the Assets, that they had a right to sell the Assets, and that the Assets had good and marketable title. (*Id.*)

The sale of the Assets to UFA was approved by Order of the U.S. Bankruptcy Court on August 25, 2009. (Ramsden Decl. ¶ 6, Ex. 4.) The assignment of the marks to UFA was recorded against the G.I. Joe's Marks in the USPTO on October 21, 2009, at Reel No. 4082, Frame 0428. (Heebner Decl. Ex. M.) UFA is the owner of all right, title and interest in the G.I. Joe's Marks. (*Id.*)

Shortly after the acquisition of the Assets, UFA began selling goods online at www.joessports.com, accessible by link from www.gijoes.com. (Ramsden Decl. ¶ 7.) UFA's website at www.joessports.com was so prominent that it was the first site located in a search for the term "g.i. joe's sports", "g.i. joes sports" or "gi joes sports" on the Google® search engine. (Ramsden Decl. Ex. 5.) UFA recently consolidated its use of the G.I. Joe's Marks on its website at www.wholesalesports.com. (*See* Ramsden Decl. Ex. 2.) A current search for the term "g.i. joe's sports", "gi joes sports" or "joe's sports" or "joes sports" on the Google®, Yahoo!® and Bing® search engines shows www.wholesalesports.com as the first hit. (Ramsden Decl. Ex. 6.)

**E.    Defendants' Selection And Use Of The Infringing Marks.**

On September 18, 2009, just three weeks after the Bankruptcy Court approved UFA's purchase of the Assets, including the G.I. Joe's Marks, from G.I. Joe's, Inc., and with actual and constructive knowledge of UFA's ownership of the Assets, including the G.I. Joe's Marks, Defendants incorporated PAGC in Oregon and, on October 2, 2009, PAGC registered the

PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION
Page 10

assumed business name, "G.I. Joe's," with the Oregon Secretary of State.  (Heebner Decl. Ex. A, N.)

On September 18, 2009, Defendants also filed applications with the USPTO (hereinafter, "PAGC Applications") for registration, in Class 35, of the three G.I. Joe's marks in connection with:

> Computerized on-line retail store services in the field of sporting goods, apparel and automotive goods; Customer service in the field of retail store services; On-line retail store services featuring a wide variety of consumer goods of others; Retail automobile parts and accessories stores; Retail clothing stores; Retail department store services; Retail sporting goods stores; Retail store and on-line retail store services featuring sporting goods, apparel and automotive goods; Retail store services featuring a wide variety of consumer goods of others; Retail store services featuring sporting goods, apparel and automotive goods:

| MARK | APPLICATION SERIAL NO. |
|---|---|
| G.I. JOE'S | 77,829,884 |
| G.I. JOE'S SPORTS OUTDOOR & MORE | 77,829,916 |
| G.I. JOE'S THE SPORTS & AUTO STORE | 77,829,899 |

(Heebner Decl. Ex. O.)

The PAGC Applications sought registration of marks that are essentially identical to UFA's G.I. Joe's Marks, and the applications cover the same services in Class 35.  The Trademark Office refused registration of the PAGC Applications, citing seven trademarks owned by UFA as being confusingly similar to PAGC's marks, including UFA's registrations for JOE'S SPORTS GEAR, JOE'S ON-DECK SERIES, JOES OUTDOOR, and JOE'S SPORTS OUTDOOR & MORE.  (Heebner Decl. Ex. P.)

On October 5, 2009, PAGC filed petitions with the USPTO to cancel three of the G.I. Joe's Marks, claiming that the subject marks had been abandoned by G.I. Joe's, Inc. prior to the assignment to UFA.  (*See* Heebner Decl. Exs. Q, R.)  PAGC's petitions to cancel contradicted

the representations by G.I. Joe's, Inc. – under the direction of the Individual Defendants – that

G.I. Joe's, Inc. legally owned the Assets, including the G.I. Joe's Marks; that it had a right to sell

the Assets, including the G.I. Joe's Marks; and that the Assets, including the G.I. Joe's Marks,

had good and marketable title.  (*Compare* Heebner Decl. Ex. Q *with* Ramsden Decl. Ex. 3.)  Due

to delay and inaction by PAGC, the cancellation actions have languished and have not proceeded

beyond their initial stages.

**F.    The "gijoesonline.com" Website.**

With full knowledge of UFA's ownership of the Assets, including the G.I. Joe's Marks,

and with full knowledge that UFA was using the domain names www.gijoes.com and

www.joessports.com to carry on the same business of the former G.I. Joe's, Inc., Defendants

registered the confusing similar domain name www.gijoesonline.com.  (Heebner Decl. Ex. S.)

Sometime after the registration date, PAGC began representing that it was G.I. Joe's:

> G.I. Joe's Sports, Auto & Outdoor.  A unique regional retailer focused on providing
> Northwest Customers with the unique merchandise and shopping experience they enjoy,
> expect and demand.  G.I. Joe's is known for its Sports, Auto & Outdoor merchandise,
> Northwest selection, value, knowledgeable service and community support.
>
> The company began as an army surplus store out of a station wagon in southeast
> Portland, Oregon.  As it shaped itself for it's customers, and the Northwest, G.I. Joe's
> became a unique retail specialist that emphasized sporting goods, automotive and outdoor
> merchandise for the authentic northwest active enthusiast.

(Heebner Decl. Ex. T.)  Moreover, on the home and contacts pages of the website, Defendants

have placed the following duplicate of UFA's mark:



(*Id.*)  Defendants have also used other G.I. Joe's Marks, including the G.I. JOE'S THE SPORTS

& AUTO STORE mark owned by UFA, in the "company history" section of the website.

(Heebner Decl. Ex. E.)

Defendants have used their website to solicit investors, to provide product information

and to advertise, promote, market, the retail sporting goods store located in Bethany, Oregon,

and to advise viewers of its intended plans to open additional stores.  (Heebner Decl. Exs. B, E.)

**G.    Events Leading Up To This Suit.**

Until May 5, 2010, UFA was unaware of PAGC's actual use of UFA's G.I. Joe's Marks.

(Ramsden Decl. ¶ 9.)  On that date, counsel for UFA discovered an article that had been

published on May 1, 2010, in the *Oregonian* newspaper, and posted online.  (Heebner Decl. ¶ 3,

Ex. B.)  The article, "(G.I.) Joe's Veterans Gear Up for Comeback," included an interview with

the Defendants wherein they discussed their January, 2010, opening of a small retail store in

Bethany, Oregon under the G.I. Joe's name.  (*Id.*)  The article included information and pictures

showing evidence of the Defendants' use of several of the G.I. Joe's Marks.  (*Id.*)  A picture

featured the Individual Defendants in a photograph standing inside their store, along with the

window-painted slogan, "G.I. Joe's.  Seize the weekend."  (*Id.*)  Finally, the store was pictured as

being filled with racks of fishing lures, raincoats and rifle lubricant.  (*Id.*; *see also* Heebner Decl.

¶ 25, Ex. X.)

Defendant Menconi was quoted in the article stating that Defendants "plan to open a full-fledged G.I. Joe's by summer's end and will reinforce their hold on the [G.I. Joe's] name." (Heebner Decl. Ex. B.)  Defendants also claim to have received a commitment from an investor that ensures enough capital to open a flagship store.  (*Id.*)  In addition, Defendants are negotiating a lease for a Westside store and have already received a business license number.  (*Id.*)

According to the *Oregonian* article, Defendants plan to open three to five stores in the Portland area over the next 18 months, some in former Joe's locations.  (*Id.*)  Defendants intend to offer the same services as were offered by the old G.I. Joe's, Inc.  (*Id.*)  Defendants refer to their new business launch as "The G.I. Joe's Comeback."  (*Id.*)

As recently as June 1, 2010, Defendants' voicemail message on its publicly available telephone number of 1-503-726-2120, states one or more of the following messages, which contain multiple infringing marks:

> G.I. Joe's, an online favorite.  Grab the gear.  Seize the weekend. . . . Thank you for calling G.I. Joe's, your sports auto and outdoor store.  A part of the Oregon's heritage since 1952.  Learn more about us soon as gijoesonline.com, and look for our new grand opening.
>
> ***
>
> Thank you for calling G.I. Joe's, your sports, auto and outdoor store.  A Northwest icon since 1952.  Go to G.I. Joe's.  Grab the gear.  Seize the weekend.  Thank you -- all of you -- for all of your support.  Look for us soon at gijoesonline.com.
>
> ***
>
> Thank you for calling G.I. Joe's, your sports auto and outdoor store.  A part of the Oregon's heritage since 1952.  Learn more about us soon as gijoesonline.com, and look for our new grand opening.

(Heebner Decl. ¶ 22, Ex. U.)

Prior to this, in November 2009, UFA warned Defendants that UFA was the rightful owner of the G.I. Joe's Marks, and that UFA would enforce its rights should Defendants begin using the marks in connection with retail store sporting goods services. (Heebner Decl. Ex. V.) Ignoring UFA's warning, Defendants subsequently launched a business under the G.I. Joe's name, to register and use a domain name that is substantially identical the registered G.I. JOE'S trademark, all with a bad faith intent to profit from such use. (*See e.g.* Heebner Decl. Exs. B, E, S, T, U, W.) Defendants also began using service marks that are identical to UFA's registered G.I. Joe's Marks, including the highly distinctive "SEIZE THE WEEKEND" slogan, and have been making numerous public statements that are false and misleading and intended to mislead consumers into believing that Defendants are the successors to the former G.I. Joe's, Inc. when, in fact, Defendants have no legal rights in any of the Assets associated the former owner.

In addition, Defendants have publicly stated that they will soon significantly expand such infringing use. As soon as it learned of the Defendants' infringing uses of the G.I. Joe's Marks and their registration of the infringing domain name www.gijoesonline.com, UFA began preparing this suit for damages and injunctive relief.

## **ARGUMENT**

"A plaintiff is entitled to a preliminary injunction in a trademark case when it demonstrates either (1) a combination of 'probable success on the merits' and 'the possibility of irreparable injury' or (2) the existence of 'serious questions going to the merits' and that 'the balance of hardships tips sharply in his favor.'" *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999) (*citing Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 723 (9th Cir. 1985)). A decision to grant a motion for a preliminary injunction is reviewed under an abuse of discretion standard. *Brookfield Comm'n*, 174 F.3d at

1045. "[R]eversal is appropriate only if the district court based its decision on clearly erroneous findings of fact or erroneous legal principles. *Id.* at 1046.

A.    **UFA WILL SUCCEED ON THE MERITS OF ITS CLAIMS.**

UFA asserts claims for trademark infringement, unfair competition, false advertising and cybersquatting claims under the Lanham Act, state statutory trademark infringement and dilution under Oreg. Rev. Stat. §§ 647.095 and 647.107, common law trademark infringement and common law unfair competition.  As described herein, UFA will succeed on the merits of each of these claims, but it only needs to succeed on one to be entitled to an injunction.

1.    **Defendants Have Infringed The G.I. Joe's Marks.**

To establish a claim for trademark infringement or unfair competition under the Lanham Act, UFA must establish that Defendants are using a mark confusingly similar to its own. *Brookfield Comm'n*, 174 F.3d at 1046.  *See also GoTo.Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000).  "Whereas section 32 [of the Lanham Act] provides protection only to registered marks, section 43(a) protects against infringement of unregistered marks and trade dress as well as registered marks, and protects against a wider range of practices such as false advertising and product disparagement."  *Brookfield Comm'n*, 174 F.3d at 1047, n.8 (citations omitted).  "Despite these differences, the analysis under the two provisions is oftentimes identical."  *Id.  See also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1288 n.2 (9th Cir. 1992) (affirming issuance of a preliminary injunction and noting that the elements of claims under 15 U.S.C. §§ 1114 and 1125(a) are "essentially the same").  In addition, "[t]here is no dispute that Oregon law's coverage for trademark and unfair competition is at least co-extensive with that of federal law, if not broader."  *Zipee Corp. v. U.S. Postal Service*, 140 F.Supp.2d 1084, 1087, n.4 (D. Or. 2000).  The purpose of the Lanham Act is "to secure to the owner of the

mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005) (*citing Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992)). Accordingly, likelihood of confusion is the key element. *GoTo.Com*, 202 F.3d at 1205.

### a.    UFA Is The Owner Of Rights In The G.I. Joe's Marks.

The first of the two required elements, that UFA owns the marks, is easily established. UFA is the owner of federal registrations for the G.I. Joe's Marks through assignment from the prior owner of the marks. (*See* Heebner Decl. Ex. C, Exs. C1-C17, Ex. M.) Under the Lanham Act, such registrations constitute *prima facie* evidence of the validity of the registered marks and UFA's "exclusive right to use the mark on the goods and services specified in the registration." *Brookfield Comm'n*, 174 F.3d at 1047. *See also* 15 U.S.C. § 1057(b).

### b.    There Is A Likelihood Of Confusion.

As to the second of the two elements, the Ninth Circuit Court of Appeals has developed the eight *Sleekcraft* factors to assist courts in determining whether there is a likelihood of confusion. *GoTo.Com*, 202 F.3d at 1205 (*citing AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979) (*abrogated on other grounds by Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 810, n.19 (9th Cir. 2003)). The factors require the Court to evaluate (1) the similarity of the marks, (2) the relatedness of the parties' goods and services, (3) the marketing channel used, (4) the strength of UFA's marks, (5) Defendants' intent in selecting the infringing marks, (6) the likelihood that the parties will expand into other markets, (7) the degree of care likely to be exercised by purchasers of the parties' goods and services, and (8) evidence of actual confusion. *GoTo.Com*, 202 F.3d at 1205. *See also Sleekcraft*, 599 F.2d at 348-349; *Meridian Transp. Resources, LLC v. Magic Carrier Resources, LLC*, 518 F.Supp.2d 1255, 1261

(D. Or. 2007).  The eight factor test is "pliant," and "[s]ome factors are much more important

than others."  *Brookfield Comm'n*, 174 F.3d at 1054.  *See also Meridian Transp.*, 518 F.Supp.2d

at 1261 (recognizing that the factors are non-exclusive and no single factor is determinative).  In

the context of the Web, "the three most important *Sleekcraft* factors are (1) the similarity of the

marks, (2) the relatedness of the goods or services, and (3) the 'simultaneous use of the Web as a

marketing channel.'"  *GoTo.Com*, 202 F.3d at 1205 (*citing Brookfield Comm'n*, 174 F.3d at

1055, n.16).  "Because of the aforementioned conflation of the factors in this area of the law, a

plaintiff is therefore entitled to a preliminary injunction in a trademark case simply when it

shows a likelihood of confusion."  *GoTo.Com*, 202 F.3d at 1205. n.5.

> **i.    The G.I. Joe's Marks and Defendants' infringing marks are identical or confusingly similar.**

The similarity of the marks "has always been considered a critical question in the

likelihood-of-confusion analysis."  *GoTo.Com*, 202 F.3d at 1205.  "Obviously, the greater the

similarity between the two marks at issue, the greater the likelihood of confusion."  *Id.* at 1206.

"When determining the similarity of the marks, three axioms apply: (1) marks should be

considered in their entirety and as they appear in the marketplace; (2) similarity is best adjudged

by appearance, sound, and meaning; and (3) similarities weigh more heavily than differences."

*Edge Wireless, LLC v. U.S. Cellular Corp.*, 312 F.Supp.2d 1325, 1330 (D. Or. 2003) (*citing

GoTo.Com*, 202 F.3d at 1206).  *See also Meridian Transportation*, 518 F.Supp.2d at 1262

("Similarity of trademarks must be tested on three levels: sight, sound, and meaning.")  In

addition, "the use of remarkably similar trademarks on different web sites creates a likelihood of

confusion amongst Web users."  *GoTo.Com*, 202 F.3d at 1206.

This case requires a comparison of the several marks.  Defendants have applied for

registration of three marks, the wording of which are essentially identical to UFA's registered

marks.  (*Compare* table at p. 11, *supra*, *with* Heebner Decl. Exs. C1, C7, C10.)  While the PAGC

Applications make no claim to a logo or stylization (*see* Heebner Decl. Ex. O), Defendants' use

of the marks on their website includes not only the identical wording of the G.I. Joe's Marks, but

also includes use of the same logos, font and stylization as the G.I. Joe's Marks.  In fact, certain

of Defendants' infringing marks are *identical* to the G.I. Joe's Marks in sight, sound and

meaning.  (*See e.g.* Heebner Decl. Exs. B, E, T, U W.)

Defendants' use of essentially identical marks on its website at www.gijoesonline.com

and on signage located at its retail store is not only likely to cause confusion, it has caused such

confusion and was undoubtedly intended by Defendants effectuate that result:

| UFA'S MARKS | DEFENDANTS' INFRINGING MARK |
|:---:|:---:|
| G.I. JOE'S<br><br> |  |

(*See* Heebner Decl. Exs. C, C1, C7, C10, E, T.)

A consumer viewing Defendants' website as shown in the right hand column above could

not help but believe that the goods and services advertised on the site originate from the same

source as the goods of the owner of the federally registered marks shown in the left hand column.

Defendants have even gone so far as to copy the slogan that has long been associated with the G.

I. Joe's Marks, namely, "SEIZE THE WEEKEND."  (*See* Heebner Decl. Exs. B, X.)  Such

blatant copying of UFA's marks evidences intent to deliberately cause confusion.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION
Page 19

### ii.    The parties' services offered under the marks are identical.

This second controlling factor stems from the conclusion that "related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *GoTo.Com*, 202 F.3d at 1206.  Phrased another way, "[w]here goods are complementary, the danger of consumer confusion is heightened." *Edge Wireless*, 312 F.Supp.2d at 1332 (*citing E. & J. Gallo*, 967 F.2d at 1291).  Moreover, "if they were used with identical products or services[,] likelihood of confusion would follow as a matter of course." *Brookfield Comm'n*, 174 F.3d at 1056.  "[T]he focus is on whether the consuming public is likely somehow to associate [Defendants' goods and services] with [UFA's]." *Id.* at 1056.

UFA and Defendants both sell sporting goods and related products, both online and through retail store locations.  The parties sell to, and compete for, the same customer base.  The services covered by the parties' federal applications and registrations are essentially identical.  In summary, this factor also weighs in favor of a likelihood of confusion.  *See Brookfield Comm'n*, 174 F.3d at 1056 (stating, where "two companies compete for the patronage of an overlapping audience[,] [t]he use of similar marks to offer similar [goods and services] accordingly weighs heavily in favor of likelihood of confusion").  *See also Sleekcraft*, 599 F.2d at 348 (concluding that public is likely to be confused as to the source of the high-speed waterskiing racing boats, which are sufficiently related to family-oriented recreational boats); *Fleishmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 152-153 (9th Cir. 1963) (deciding that the public would be confused by beer and whiskey sold under the same trade name because the products are sufficiently similar).

### iii. The parties advertise and promote their goods and services in the same marketing channels.

The third controlling factor is whether the parties advertise and promote their goods and services in the same marketing channels. Applied to the present case, this factor also weighs in favor of a likelihood of confusion.

UFA and Defendants both advertise and promote their goods and services in the State of Oregon and surrounding region. UFA reaches consumers in at least 15 stores in that area, including 3 in Oregon, and online at www.wholesalesports.com. Defendants thus far reach consumers in their Bethany, Oregon store and plan to open additional stores in Oregon this summer. Defendants plan to open at least 3 stores in the Portland area, where UFA already has a Wholesale Sports store.

Even more significantly, both parties use the Internet extensively as a marketing tool. Where both parties "utilize the Web as a marketing and advertising facility . . . courts have consistently recognized [that factor] as exacerbating the likelihood of confusion." *Brookfield Comm'n*, 174 F.3d at 1057. This is because "entering a web site takes little effort – usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership." *Id.* Consumers may be confused into believing that one party licensed goods or services from the other party, or that one of the companies bought the other out. *Id.* Regardless of the manner of confusion, the key is that the Lanham Act protects against all of it. *Id.* at 1057.

Both parties market their services to retail consumers on their websites through use of their marks. UFA identifies the following G.I. Joe's Marks on its website at www.wholesalesports.com:

PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION
Page 21




(Ramsden Decl. Ex. 2.)  Defendants use the following infringing mark on their website at

www.gijoesonline.com:



(Heebner Decl. Exs. E, T.)  Both parties use their sites to advertise retail sporting goods and

related goods.  Any consumer clicking onto either one of these sites would inevitably believe that

the services advertised on the sites were provided by the same party, all to the detriment of UFA

as the legal owner of the G.I. Joe's Marks and successor to the goodwill of the former G.I. Joe's,

Inc.  Therefore, this factor also weighs in favor of a likelihood of confusion.

### iv.    The G.I. Joe's Marks are strong.

"The more likely a mark is to be remembered and associated in the public mind with the

mark's owner, the greater protection the mark is accorded by trademark laws."  *GoTo.Com*, 202

F.3d at 1207.  "This 'strength' of the trademark is evaluated in terms of its conceptual strength

and commercial strength."  *Id.* (*citing* 2. J. Thomas McCarthy, *Trademarks and Unfair*

*Competition* § 11:83 at 11-143 (rev. ed. 1999)).  Strong or distinctive marks receive greater

protection than weaker marks.  *Edge Wireless*, 312 F.Supp.2d at 1334.  "Marks are often

classified in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3)

suggestive, (4) arbitrary, or (5) fanciful." *Id.* (*citing E. & J. Gallo*, 150 F.3d at 1047). "In general, fanciful, arbitrary and suggestive marks receive automatic protection because of their inherent distinctiveness, whereas descriptive marks are protected only upon proof of distinctiveness acquired in commerce." *Interstellar Starship Services, Ltd. v. Epix, Inc.*, 304 F.3d 936, 943, n.6 (9th Cir. 2002).

This factor weighs in favor of a likelihood of confusion because the G.I. Joe's Marks are inherently strong marks that have acquired additional strength, fame and recognition through extensive use in commerce for many decades. Indeed, the G.I. Joe's Marks have achieved such iconic status in the Portland region that the Court may take judicial notice of that fact. Regardless, because many of Defendants' marks are identical to the G.I. Joe's Marks, because the goods and services offered by the parties are closely related, and because the parties promote and advertise their services in the same marketing channels, "the strength of the mark is of diminished importance in the likelihood of confusion analysis." *Brookfield Comm'n*, 174 F.3d at 1059. *See also GoTo.Com*, 202 F.3d at 1208 (underlying this conclusion). "Whether a mark is weak or not is of little importance where the conflicting mark is identical and the goods are closely related." *Id.* (*citing* McCarthy, *Trademarks and Unfair Competition* § 11:76).

### v.    Defendants intended to select an infringing mark.

"This [fifth] factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *Brookfield Comm'n*, 174 F.3d at 1059. "In the Internet context, in particular, courts have appropriately recognized that the intentional registration of a domain name knowing that the second-level domain is another company's valuable trademark weighs in favor of likelihood of confusion." *Id.*

There can be no question as to this factor in this case – Defendants adopted the infringing marks intentionally and with actual knowledge that UFA owned the identical or confusingly similar G.I. Joe's Marks.  A mere three weeks after UFA purchased the G.I. Joe's Marks, Defendants incorporated PAGC and on the same day filed applications for the marks G.I. JOE'S, G.I. JOE'S THE SPORTS & AUTO STORE and G.I. JOE'S SPORTS, OUTDOOR & MORE. Shortly thereafter, Defendants registered the assumed business name "G.I. Joe's" with the Oregon Secretary of State and filed petitions to cancel the aforementioned marks owned by UFA.  In addition, Defendants' website and voicemail messages make it clear that Defendants are intentionally trying to steal the goodwill associated with the G.I. Joe's Marks.

Despite all of these facts, "an intent to confuse consumers is not required for a finding a trademark infringement." *Brookfield Comm'n*, 174 F.3d at 1059.  "Instead, this factor is only relevant to the extent that it bears upon the likelihood that consumers will be confused by the alleged infringer's mark (or to the extent that a court wishes to consider it as an equitable consideration)." *Id.  See also Sleekcraft*, 599 F.2d at 348, n.10.

### vi.    The parties will expand into other markets.

Although this sixth factor is a "relatively unimportant" one in the analysis where the parties already compete with each other, *GoTo.Com*, 202 F.3d at 1209, it bears noting that this factor weighs in favor of UFA in this case because Defendants have publicly stated that they are planning to open three to five stores in the Portland area over the next 18 months, some in former Joe's locations, and have gone so far as to call their efforts "The G.I. Joe's Comeback." Defendants' voicemail message even goes so far as to tell listeners to "learn more about [them] soon at gijoesonline.com, and to look for [their] new grand opening."  (Heebner Decl. Ex. U.) Whatever confusion consists at the time of filing this Complaint is certain to increase if the

Defendants are allowed to carry out their plan to expand their business under the branding of the G.I. Joe's Marks owned by UFA.

### vii.    Degree of care likely to be exercised by the purchasers.

The seventh factor is the degree of care likely to be exercised by the purchasers of the goods and services as affecting the likelihood of confusion.  "Likelihood of confusion is determined on the basis of a 'reasonably prudent consumer.'"  *Brookfield Comm'n*, 174 F.3d at 1060 (*citing Dreamwerks Prod. Group v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998)).  "It is generally assumed that consumers with expertise or who are buying expensive products or services exercise a greater degree of care when doing so and thus are less easily confused."  *Edge Wireless*, 312 F.Supp.2d at 1333.  "On the other hand, when dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely."  *Brookfield Comm'n*, 174 F.3d at 1060.  However, confusion may often be likely even in the case of expensive goods sold to discerning customers.  *Sleekcraft*, 599 F.2d at 353.

As applied to the present case, although some consumers of retail sporting goods and services may exercise a higher degree of care, most consumers are likely to be dealing with less expensive products and therefore exercising a much lower degree of care in choosing from their retail options.  This is especially true for the parties' online consumers, as an alternative retailer is just a "click of the mouse" away.  *See GoTo.Com*, 202 F.3d at 1209.  UFA's consumers will undoubtedly be confused by Defendants' use of identical or confusingly similar marks in the offering of their retail goods and services.

### c.    The G.I. Joe's Mark Was Not Abandoned.

The G.I. Joe's mark was not abandoned, as Defendants will contend.  To show abandonment, Defendants must show that the trademark owner (1) discontinued use of the

trademark, (2) with intent not to resume such use.  *Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (D. Or. 2007).

In this case, use was not discontinued.  For example, the G.I. Joe's domain name remained in use through the liquidation of the company.  The trademark remained in use as the name of the company G.I. Joe's, Inc. through its dissolution.  (Heebner Decl. Ex. D.)  The bankruptcy estate represented and warranted to UFA in the Purchase Agreement that it owned good and marketable title to the Assets, including the G.I. Joe's Marks.  (Ramsden Decl. Ex. 3.)  Moreover, UFA began using the G.I. Joe's Marks shortly after acquiring them.  (Ramsden Decl. ¶ 7.)  The very sale of the marks for $215,000 indicates that G.I. Joe's, Inc. and UFA both understood that the marks had been in use, were still valuable and would continue to have value by being used.

2.      **Defendants Have Falsely Advertised That They Are Associated With The G.I. Joe's Marks.**

Section 43(a) of the Lanham Act prohibits false or misleading representations made in the course of advertising or promotion.  15 U.S.C. § 1125(a)(1)(B).  In the Ninth Circuit, a Lanham Act false advertising claim requires proof of five elements:

(1)     a false statement of fact by the defendant in a commercial advertisement about its own or another's product;

(2)     the statement actually deceived or has the tendency to deceive a substantial segment of its audience;

(3)     the deception is material, in that it is likely to influence the purchasing decision;

(4)     the defendant caused its false statement to enter interstate commerce; and

(5)     the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

As discussed above, Defendants have made false and misleading statements on the website at www.gijoesonline.com, on the voicemail message associated with the telephone number of Defendants ("1-503-726-2120"), on signage located at the retail store in Bethany, Oregon, and in statements made to the press, all of which create the false impression that the Defendants are the successors to, and owners of the rights of the original G.I. Joe's, Inc. (*See e.g.* Heebner Decl. Exs. B, E, T, U, W, X.) Defendants have intentionally put forth false information, such as "The G.I. Joe's Comeback" announcement, which is clearly intended to deceive the public into believing that the former owners are bringing back the G.I. Joe's store. These statements are false and show an intent to deceive – not merely a tendency to deceive.

The deception is material. The very reason that Defendants are using a mark that they do not own is precisely because the mark holds the power to influence the purchasing decisions of consumers. Defendants are banking on consumer confusion to attract business to their store.

Defendants have caused and are causing these false statements to enter interstate commerce through their website, their voicemail messages, and in statements made to the press that were published in the *Oregonian*, as well as on the window signage on the front of their retail store.

UFA has been damaged and continues to be damaged by Defendants' false statements. Defendants are lessening the goodwill of the G.I. Joe's Marks by merely reselling goods that they buy at Costco. (*See* Heebner Decl. Exs. B, X.) The reputation and goodwill in the G.I. Joe's Marks was not built on reselling goods from Costco. In short, UFA is likely to prevail on its false advertising claim.

### 3.  **Defendants Have Diluted The G.I. Joe's Marks.**

The Oregon Anti-Dilution Statute provides:

> Subject to the principles of equity, the owner of a mark that is famous and distinctive in this state, inherently or through acquired distinctiveness, is entitled to an injunction against another person's commercial use of the mark if: (a) the other person's use began after the mark became famous; and (b) the use is likely to cause dilution of the famous mark.

Or. Rev. Stat. § 647.107(1).  In other words, "the owner of a famous mark is entitled to injunctive relief throughout the geographic area in which the court finds that the mark became famous before the other person began the other person's use of the mark."  *Id.* § 647.107(3).

### a.    The G.I. Joe's Marks Are Famous And Distinctive In Oregon.

A mark is "famous" under the statute if the general public in Oregon "widely recognizes the mark as a designation of the source of the mark owner's goods or services."  *Id.* § 647.107(2).  According to the statute, in determining whether a mark is famous in Oregon, the court may consider the following non-exclusive factors:

> (a) the duration, extent and geographic reach of advertising and publicity of the mark in this state by the owner or by other persons; (b) the amount, volume and geographic extent of sales of goods or services offered under the mark in this state; (c) the extent to which the mark is actually recognized in this state; and (d) whether the mark is registered . . . under [state or] federal law.

Or. Rev. Stat. § 647.107(2).  "A trademark may develop distinctiveness 'in a variety of ways: long use, consistent superior quality instilling customer satisfaction, or extensive advertising.'"  *Starbucks Corp. v. Lundberg*, 2005 WL 3183858, *7 (D. Or. Nov. 29, 2005) (*citing Wedgwood Homes, Inc. v. Lund*, 659 P.2d 377, 380 (Or. 1983)).  Distinctiveness is also referred to as "secondary meaning."  *Starbucks Corp.*, 2005 WL 3183858 at *7.

That the G.I. Joe's Marks are famous and distinctive in Oregon is demonstrated by several facts.  First, G.I. Joe's, Inc. thrived for 57 years in Oregon before it was ultimately dissolved in 2009, growing from a single store to 31 locations and a significant online presence.  Second, G.I. Joe's, Inc. invested heavily in the G.I. Joe's Marks, using the marks on store

signage and displays, on its Internet website, on extensive advertising, marketing and promotional materials, as well as on store displays, uniforms, store mats, billboards, print ads, website promotions, product labeling, and in other ways customary in the industry, at a substantial cost.  (*See e.g.* Heebner Decl. Exs. C1-C17, F, G.)  Third, when G.I. Joe's made a decision to drop the "G" and the "I" from several of its service marks in 2007, the decision was widely criticized by Oregon consumers, who resisted the change.  (*See e.g.* Heebner Decl. Ex. F at p. 5.)  Such public concern regarding relatively minor changes to a service mark demonstrates the iconic status that the G.I. Joe's Marks have achieved in the region.  These facts easily establish the famousness and distinctiveness of the G.I. Joe's Marks in the State of Oregon.  *See Wedgwood Homes*, 659 P.2d at 380 (affirming finding of dilution where 25 years of use in plaintiff's mark and heavy investment in advertising the mark established secondary meaning); *Starbucks Corp.*, 2005 WL 3183858 at *7 (noting that extensive advertising supports distinctiveness).

        **b.**     **Defendants Began Using The Infringing Marks Long After The G.I. Joe's Marks Became Famous.**

Defendants did not incorporate PAGC until September 18, 2009, 57 years after G.I. Joe's, Inc. was formed and began operating in Oregon.  Defendants did not begin using the infringing marks until January, 2010, when they opened up their retail store in Bethany and began advertising their services on the website located at www.gijoesonline.com.  In short, Defendants' use did not begin until 2010, decades after the G.I. Joe's Marks had become famous and distinctive in Oregon, and several months after the sale and assignment of the G.I. Joe's Marks to UFA.

       **c.**     **Defendants' Use Of The Infringing Marks Is Likely To Cause Dilution Of The Famous G.I. Joe's Marks.**

Dilution may arise in three situations under Oregon law.  First, dilution may arise because of injury to the value of the mark caused by actual or potential consumer confusion.  *Wedgwood Homes*, 659 P.2d at 381.  Second, dilution may occur when use of the mark "detracts from the reputation associated with plaintiff's mark."  *Id.*  Third, dilution may be caused by "a diminution in the uniqueness and individuality of the mark caused by another's use of the same or similar mark."  *Id.*  Defendants' use of the infringing marks in the present case is diluting the G.I. Joe's Marks in each of these ways.

First, Defendants' use of identical and similar marks is injuring the value of the G.I. Joe's Marks by causing confusion among consumers as to the ownership of the marks and the origin of the goods and services provided under the marks.  Second, Defendants' public statements as to opposing claims of ownership and possible legal battles are causing dilution of the mark by detracting from the reputation associated with the G.I. Joe's Marks, as is the fact that Defendants are reselling goods purchased at Costco out of their G.I. Joe's retail store.  Finally, Defendants' unauthorized public use of the G.I. Joe's Marks in connection with services that are identical or substantially similar to UFA's goods and services is causing dilution by diminishing the uniqueness and individuality of the G.I. Joe's Marks.

UFA has proven that it is likely to succeed on the merits of its statutory dilution claim. The G.I. Joe's Marks are famous and distinctive in Oregon, Defendants did not begin using the marks until long after the G.I. Joe's Marks became famous, and Defendants' use of the marks is likely to cause dilution of the G.I. Joe's Marks in ways noted above.

**4.    Defendants Have Engaged In Unlawful Cybersquatting.**

"Cybersquatting occurs when a person other than the trademark holder registers the

domain name of a well known trademark and then attempts to profit from this by . . . using the

domain name to divert business from the trademark holder to the domain name holder." *Bosley*

*Medical*, 403 F.3d at 680 (citing *DaimlerChrysler v. The Net, Inc.*, 388 F.3d 201, 204 (6th Cir.

2004)).  According to the Ninth Circuit Court of Appeals:

> A trademark owner asserting a claim under the [Anticybersquatting Consumer Protection
> Act] must establish the following: (1) it has a valid trademark entitled to protection; (2)
> its mark is distinctive or famous; (3) the defendant's domain name is identical or
> confusingly similar to, or in the case of famous marks, dilutive of the owner's mark; and
> (4) the defendant used, registered or trafficked in the domain name (5) with a bad faith
> intent to profit.

*Bosley Medical*, 403 F.3d at 681.  *See also Zipee Corp.*, 140 F.Supp.2d at 1087; 15 U.S.C. §

1125(d)(1)(A).  The key to a cybersquatting claim is the bad faith intent to profit from the mark.

*Bosely Medical*, 403 F.3d at 681.

As described above, UFA has established the first, second, third and fourth factors.  As to

the fifth factor, Congress has established a list of nine considerations for courts to use in

determining whether a defendant had a bad faith intent to profit from a mark.  *See* 15 U.S.C. §

1125(d)(1)(B).  Even so, however, "Congress did not mean for these factors to be an exclusive

list; instead, 'the most important grounds for finding bad faith are the unique circumstances of

the case, which do not fit neatly into the specific factors enumerated by Congress.'"  *Interstellar*

*Starship*, 304 F.3d at 946-47 (*citing Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d

264, 271 (4th Cir. 2001)).

In the present case, the facts overwhelmingly point to the conclusion that Defendants had

a bad faith intent to profit from the mark when they selected the G.I. JOE'S mark and began

using it as the only distinctive component of their domain name, www.gijoesonline.com.  By

combining UFA's registered mark with the descriptive term "online," Defendants plainly

identify that URL as the website selling G.I. Joe's goods online, which clearly indicates a bad

faith intent to profit from the use of the G.I. Joe's Marks.  Defendants' actions are nothing more

than a naked attempt to divert business from the trademark holder to the domain name holder.

As former executives of G.I. Joe's, Inc., the Individual Defendants were themselves well

aware of the existence of the Assets, including the G.I. Joe's Marks and domain names

www.gijoes.com and www.joessports.com, and they knew that consumers in the State of Oregon

and surrounding region had been visiting those websites for years.  By adding the word "online"

to the domain name already owned by UFA, namely, www.gijoes.com, Defendants created a

domain name that deceptively appears to be the "online" option for G.I. Joe's goods.

Also pointing to bad faith is that Defendants intended to select a mark as logically related

to www.gijoes.com as possible, in order to begin redirecting traffic to its site and away from

visitors of www.gijoes.com.  Indeed, once visitors get to the site at www.gijoesonline.com,

Defendants are using multiple infringing marks on the website that further enforce the mistaken

impression that a viewer has arrived at the web site for the G.I. Joe' Marks:



(Heebner Decl. Exs. E, T.)  Given all of the above, UFA will likely succeed on the merits of its

cybersquatting claim.

**B.**    **THE COURT MAY PRESUME IRREPARABLE HARM.**

A showing of likelihood of success on the merits in a trademark case allows the court to presume irreparable harm. *GoTo.Com*, 202 F.3d at 1209. This is because "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." *Edge Wireless*, 312 F.Supp.2d at 1335 (*citing Brookfield Comm'n*, 174 F.3d at 1066). *See also Metro Pub., Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir.1993) ("Once the plaintiff has demonstrated a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted") (*abrogated on other grounds by Roe v. Anderson*, 134 F.3d 1400, 1402, n.1 (9th Cir. 1998). Indeed, consumer confusion is so damaging that, in both trademark infringement cases and unfair competition cases under Section 43(a) of the Lanham Act, a court may presume irreparable harm when a trademark owner demonstrates a likelihood of success on the merits. *Brookfield Comm'n*, 174 F.3d at 1066; *Edge Wireless*, 312 F.Supp.2d at 1335.

As described above, due to the identical nature of the marks, the closely related nature of the goods and services advertised and promoted under the marks, and the identical trade channels through which the goods and services are sold, among other factors, a likelihood of confusion exists between the G.I. Joe's Marks and Defendants' infringing marks. Accordingly, UFA has demonstrated a likelihood of success on the merits of its trademark infringement, unfair competition and false advertising claims. UFA has also demonstrated a likelihood of success on the merits of its dilution and cybersquatting claims. Under applicable Ninth Circuit case law, irreparable harm may be presumed. *See GoTo.Com*, 202 F.3d at 1209 (stating, "[f]rom this showing of likelihood of success on the merits in this trademark infringement claim, we may

presume irreparable harm," and reinstating preliminary injunction); *Brookfield Comm'n*, 174 F.3d at 1066 ("Having concluded that [plaintiff] has established a likelihood of success on the merits of its trademark infringement claim, we analyze the other requirement for preliminary injunctive relief inquiry, irreparable injury . . . [which] may be presumed from a showing of likelihood of success on the merits").

## C.    THE BALANCE OF HARMS FAVORS ISSUANCE OF THE PRELIMINARY INJUNCTION.

This factor need not be considered where the plaintiff demonstrates a combination of success on the merits and the possibility of irreparable injury. *See GoTo.Com*, 202 F.3d at 1209 (recognizing that because GoTo had demonstrated the combination of success on the merits and the possibility of irreparable injury, the court need not address whether the balance of the hardships tips sharply in favor of GoTo). Nonetheless, the balance of the hardships tips sharply in UFA's favor because it is the owner of federally registered trademarks for which it paid a substantial sum of money. Through their use of infringing marks in connection with their retail store location and website, Defendants are undoubtedly diverting customers away from UFA and will continue to do so until such use is enjoined. If Defendants are allowed to open additional stores or begin selling goods and services online, the harm to UFA will increase significantly. Defendants, on the other hand, who are using the infringing marks and have no ownership rights in the G.I. Joe's Marks, will suffer minimal hardship if their actions are enjoined until a trial can be held on the merits.

Each of the factors weighs in favor of granting the preliminary injunction to prohibit Defendants' continuing infringement of the G.I. Joe's Marks. Accordingly, UFA's motion should be granted.

**D.**    **THE COURT SHOULD NOT REQUIRE UFA TO POST A BOND.**

The district court is afforded wide discretion as to whether it will require a bond and for how much.  *Edge Wireless*, 312 F.Supp.2d at 1336.  The bond amount may be zero if there is no evidence that the party will suffer damages from the injunction.  *See Gorback v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000).

Here, Defendants can hardly complain that they will suffer damages if an injunction is granted to prohibit them from using willfully infringing marks.  Defendants are in the process of launching their business, although they have not yet opened anything more than a small retail store and a website under infringing marks.  In short, no bond should be required.  *See Edge Wireless*, 312 F.Supp.2d at 1336 ("[T]he court is not inclined to require a bond at this time").

**CONCLUSION**

For the foregoing reasons, plaintiff UFA Holdings, Inc. respectfully requests that defendants The Performance Acquisition Group Company, David Orkney, B.G. Eilertson, Ron Menconi, Ed Ariniello, John Does 1 through 5 and John Doe Entities 1 through 5 be enjoined from using marks that infringe UFA's G.I. Joe's Marks during the pendency of this matter.

Respectfully submitted,


Dated:  June 7, 2010                    By:      /s/ Stephen J. Joncus
                                                 Stephen J. Joncus, OSB #013072
                                                 Email:  stephen.joncus@klarquist.com
                                                 KLARQUIST SPARKMAN, LLP
                                                 121 S.W. Salmon Street, Suite 1600
                                                 Portland, Oregon  97204
                                                 Telephone:  503-595-5300
                                                 Facsimile:  503-595-5301

                                                 *Attorneys for Plaintiff UFA Holdings, Inc.*


Of Counsel:

Thomas J. Shroyer (MBA #100638)
Email:  shroyert@moss-barnett.com
Kristin B. Heebner (MBA #331235)
Email:  heebnerk@moss-barnett.com
MOSS & BARNETT
A Professional Association
4800 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-4129
Telephone:  612-877-5000
Facsimile:  612-877-5999


1606316v3